# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **DANIEL EDWARDS**, | * | |
| *Plaintiff*, | * | |
| v. | * | **Civil Case No. 1:24-cv-01350-JMC** |
| **THE MAYOR AND CITY COUNCIL** | * | |
| **OF BALTIMORE CITY, MARYLAND** | | |
| | * | |
| *Defendant*. | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Daniel Edwards ("Plaintiff") initiated the present suit against the Mayor and City Council of Baltimore City, Maryland ("Defendant") on May 8, 2024.  (ECF No. 1).  Plaintiff alleges (1) a violation of Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e *et seq*. ("Title VII") based on racial discrimination; (2) a violation of Title VII based on a hostile work environment; (3) a violation of Title VII based on retaliation; (4) a violation of 42 U.S.C. § 1981; and (5) a violation of the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't, § 20-601 *et seq*. ("MFEPA").  (ECF No. 1 at 12-21).[1]  Presently pending before the Court are the parties' cross Motions for Summary Judgment.  (ECF Nos. 29, 34).  The Motion is fully briefed,[2] (ECF Nos. 29, 34, 39) and no hearing is necessary pursuant to Local Rule 105.6 (D. Md.

---

[1] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document. If there are none, the Court is referring to the page number of the PDF.

[2] On January 14, 2026, the Court issued an Order that no further extensions to the briefing schedule would be granted, even by consent, in light of the several extensions already granted.  (ECF No. 39).  The time for Plaintiff to file a reply has now passed, and he failed to do so.

2025).  For the reasons that follow, Defendant's motion for summary judgment will be GRANTED

in part and DENIED in part, and Plaintiff's motion for summary judgment will be DENIED.

## I.     BACKGROUND

The instant litigation concerns several allegations that each transpired over a decade ago.

Defendant employed Plaintiff at the Baltimore City Fire Department ("BCFD") from November

3, 2006, to the present day as a Firefighter/Paramedic ("FF/PM").  (ECF No. 34-9 at 31); (ECF

No. 29-3).  Plaintiff filed a charge alleging racial discrimination with the Equal Employment

Opportunity Commission ("EEOC") on May 16, 2013.  (ECF No. 29-6).  At that time, Plaintiff

was working at the Smokestack Hardy Fire Station ("Engine 13"). *Id.* at 2. In that charge, Plaintiff

alleges that in early January of 2013, he was the target of racial discrimination at work. *Id.* Taking

the allegations in chronological order, Plaintiff seeks recovery for the following instances of

conduct:

### i.     *Allegations Stemming from Events in 2009 and 2010*

From what the Court can discern, the primary conduct at issue concerns an altercation about

a soiled dinner plate on January 19, 2013, and January 20, 2013.  However, in an EEOC Charge

that Plaintiff filed in 2013, (the "2013 Charge"), Plaintiff also references two instances of alleged

discrimination in 2009 and 2010, in which white employees at Engine 13 "strung [Plaintiff's]

BCFD 'turnout' gear up in the ceiling" and he was charged with being "un-trainable" respectively.

(ECF No. 29-6). According to Plaintiff, "[t]he alleged discriminatory conduct began as early as

August 2009, when Plaintiff was involved in an incident at Engine 13 with his white supervisor,

Joshua Shaffer, during which Plaintiff was threatened, and an argument ensued that resulted in

discipline."  (ECF No. 34 at 3).  The specific details of this incident are unclear. He continues in

reference to an incident that does not appear to be connected to the allegations set forth in the 2013

Charge[3]: "Plaintiff's disciplinary history, including the suspension arising from the August 2009 incident in which he was accused of threatening another member with a knife/tool, is referenced by the Department in later Workplace Violence documentation as part of its justification for subsequent actions against him." *Id.*

ii.    *January 2013 Allegations of Racial Discrimination*

The allegations clearly included in the 2013 Charge articulate the following incidents: Plaintiff first alleges that on January 6, 2013, he received a phone call from FF Harold Snyder in which FF Snyder told him, "You're not Engine 13 material and you have to go." *Id.* at 1. Thereafter, Plaintiff "called [his] immediate supervisor, [Lieutenant] Wayne Felix, right after the phone call" and reported racial discrimination. *Id.* Lieutenant Felix indicated he was also new and would do what he could, but "[could not] change these guys' minds in here." *Id.*

Second, on January 19, 2013, Plaintiff alleges that upon opening his locker, he found a soiled dinner plate with a note that read, "you left your dinner in the refrigerator. Please put away the next time covered. Your mother does not work here. Thank you for your anticipated cooperation, management." *Id.* at 3. Following that discovery, Plaintiff showed the note to Lieutenant Felix and put the plate in the trash can. *Id.* Lieutenant Felix told Plaintiff to lock his locker to avoid similar events in the future. *Id.* Plaintiff alleges Engine 13 had a house policy to "leave lockers open so that relieving members can put away the gear of relieved members, in the appropriate locker(s)." *Id.*

---

[3] Defendant's reply clarifies that Defendant challenges the timeliness of the following allegations,

> [A]ll allegations that occurred prior to 300-days before Plaintiff filed his Charge on May 16, 2013, with the EEOC must be procedurally dismissed ie. #5 allegation in the EEOC Charge regarding August 2009, #6 allegation in the EEOC Charge regarding August 2010 and #7 allegation in the EEOC Charge regarding four years prior to the filing date.

(ECF No. 39 at 5). Based on Defendant's specification above, these are the allegations the Court will consider regarding the timeliness of Plaintiff's claims.

Third, Plaintiff alleges that the next night, on January 20, 2013, he found "the same offensive note and soiled dinner plate" in his locker. *Id.* At an in-person report in the kitchen to Lieutenant Felix about the note's reappearance in Plaintiff's locker, Plaintiff asserts that a Firefighter/EMT ("FF/EMT") Daniel Remeikis entered the kitchen and subsequently said, "that plate you had, its [sic] back in your locker." An argument broke out, during which Plaintiff asserts he picked up the "plate [and] threw it underhand toward the trash can; [he] missed." *Id.* "[I]t hit the wall behind the trash can, and broke." *Id.* Thereafter, Pump Operator ("PO") Ryan Wenger joined the argument. *Id.* Plaintiff alleges he took Mr. Remeikis "in arguing with [him], threatening [him], and attempting to give [him] orders." *Id.* Plaintiff filed internal discrimination charges against Mr. Remeikis and Mr. Wenger. *Id.* They also filed charges against Plaintiff for assault. *Id.* Additionally, the Battalion Chief filed a charge against Plaintiff. *Id.*

        iii.     *Internal Investigation and Disciplinary Action Resulting from January 20, 2013, Altercation*

In an investigation report, Battalion Chief James Green recommended that Plaintiff should be charged with violating certain policies against throwing objects at other employees and for insubordination. (ECF No. 29-13 at 14). He further recommended that "[t]he counter-complaints filed by FF/PM Edwards against EFF Remeikis…,PO Wenger…, and FF Snyder…should be dismissed due to a lack of evidence and other technical reasons." *Id.* Plaintiff received a fifteen-day suspension without pay as a result of his conduct in the January 20, 2013 altercation. (ECF No. 14). Thereafter, a disciplinary hearing took place on March 28, 2013, to evaluate PO Wenger's conduct. *Id.* at 15-16. After that hearing, the Deputy Chief of Training and Education, Mr. Paul Moore, recommended that Mr. Wenger receive a two-day suspension without pay for his conduct in the January 20, 2013, altercation. *Id.* at 17.

        iv.     *Internal Investigation and Disciplinary Action Resulting from FF Harold Snyder's Phone Call Remarks*

On January 21, 2013, Plaintiff filed a detailed Complaint against FF Harold Snyder after the phone call during which FF Snyder told Plaintiff he did not belong at Engine 13 and was not "Engine 13 material." (ECF No. 29-17 at 14). In the ensuing investigation, Battalion Chief Green noted the Plaintiff "eluded to a suspicion that he had in reference to the members at the station were trying to create a 'Caucasian only fire house.'" *Id.* at 12. To that end, the Battalion Chief included the following:

> After interviewing several Arican American members I found this comment to be baseless and an attempt to divert from the facts. Additionally, FF/PM Edwards made no mention of the "Caucasian only fire house" during his 45 minute interview. It appeared a week later in a written statement. Additionally, all African American members interviewed reported the opposite in that they felt welcomed at the Station of Engine 13. No member reported that they were subjected to or witnessed anything that could be construed as racially biased or discriminatory.

*Id.*

Thus, the complaint against FF Snyder was dismissed for a lack of evidence. *See id.* Plaintiff's counsel also refers to an allegation that un-named individuals called Plaintiff a racial slur at an unspecified time.[4] (ECF No. 34 at 5). The only reference the Court can find of an alleged racial

---

[4] Plaintiff cites to several points in the record in support of this serious allegation: "Plaintiff's 06.30.2025 Deposition, pp. 199:17–19, 203:4–204:21, 225:11–15, 226:16–21, 228:18–229:8; Defendant's Ex. 5, EEOC Charge No. 12B-2013-00011 & Position Statement, pp. 2–4; Defendant's Ex. 9, BCRC Memo & EEOC Charge No. 12B-2010-00015, pp. 2–3; Defendant's Ex. 12, Disciplinary Process Routing Form, Workplace Violence Incident Report, Complaint Report, and Special Reports, pp. 2–5, 7–10." (ECF No. 34 at 5). Taking each in turn, review of the record shows as follows:

(1) Plaintiff's deposition, ECF No. 34-10 at 23 (199:17–19) refers to attorney payments and litigation costs;
(2) *Id.* at 27-28 (203:4–204:21) describes stress Plaintiff experienced after the dinner plate altercation;
(3) *Id.* at 49 (225:11–15) describes the first page of Plaintiff's first transfer request;
(4) *Id.* at 50 (226:16–21) refers to the Battalion Chief's disapproval of Plaintiff's transfer request;
(5) *Id.* at 52-53 (228:18–229:8) describes Plaintiff's second transfer request;
(6) ECF No. 29-7 (Defendant's Ex. 5, EEOC Charge No. 12B-2013-00011 & Position Statement, pp. 2–4) includes Defendant's August 7, 2013 response to Plaintiff's internal complaint and concluded that the disciplinary action against Plaintiff was a result of his conduct and not racial animus; it includes that "there is no indication that [Plaintiff] was subjected to racial slurs or references to race that would allow for the inference of race discrimination." *Id.* at 5. There is no other reference on this document to a racial slur;
(7) ECF No. 29-11 (Defendant's Ex. 9, BCRC Memo & EEOC Charge No. 12B-2010-00015, pp. 2–3) includes Plaintiff's April 19, 2010 request "that his complaint against Baltimore City Fire Department be withdrawn from further investigation" and the EEOC's subsequent confirmation that it will discontinue its investigation.

slur is FF/EMT Remeikis's use of the phrase, "lil' boy" in the context of the soiled-dinner plate argument. *See* (ECF No. 29-14 at 11-12).

v.    *Ensuing Transfers and Position Changes*

Plaintiff avers that "[t]he disparate treatment also extended to departmental transfer policies." (ECF No. 34 at 4). Plaintiff asserts he "and his harassers were involuntarily transferred," but FF/EMT Remeikis "was subsequently granted a voluntary transfer to a preferred assignment before the one-year period had elapsed." It appears that Plaintiff was transferred to Engine 44 as a result of the January 2013 incident on April 18, 2013. *See* (ECF No. 34-8 at 1). The record shows that on June 30, 2013, Plaintiff applied for transfer from Engine 44 to Engine 20 or back to Engine 13. *Id.* His request was denied. *Id.* Plaintiff applied for transfer to Engine 20 or Engine 46 again on December 21, 2013, which Defendant also denied. *Id.* at 2. In Plaintiff's deposition, Plaintiff clarifies that he eventually was approved for transfer for his second choice, Engine 46, as a result of his December 2013 transfer request. (ECF No. 34-10 at 56). The evidence pertaining to the details of FF/EMT Remeikis's transfer is unclear in the record, but Plaintiff did testify that "Remeikis had already been gone on his way to 33" at some point prior to one or both of Plaintiff's transfer requests. *Id.* at 53. The above notwithstanding, Defendant later promoted Plaintiff to Fire Lieutenant, Suppression, ALS on December 14, 2016. (ECF No. 29-4).

---

These documents appear connected to an unclear 2009 disciplinary hearing that was postponed due to an ongoing criminal proceeding against Plaintiff. (ECF No. 29-11 at 4); and

(8) ECF No. 29-14 (Defendant's Ex. 12, Disciplinary Process Routing Form, Workplace Violence Incident Report, Complaint Report, and Special Reports, pp. 2–5, 7–10) includes FF/EMT Daniel Remeikis's Workplace Violence Incident Report against Plaintiff for "threatening [him] with a knife/tool." (ECF No. 29-14 at 3). It further includes FF/EMT Remeikis's January 21, 2013 complaint against Plaintiff for the dinner plate altercation. *Id.* at 9. At page 11, the exhibit includes Plaintiff's report against FF/EMT Remeikis for the same event. *Id.* at 11. In that document, Plaintiff alleged that an EMT/FF said "you're a fucking bum!" and "…you're a fucking lil boy!!," to which Plaintiff responded "NO! If I was truly a lil boy, I would have believed what you say about me and left, but I got more pride in myself that you think and you're mad because you can't do anything about it." *Id.* at 12. After Plaintiff threw the dinner plate at the wall toward PO Wenger, Plaintiff reported being called a "motherfucker" as the altercation continued to escalate. *Id.* At a certain time during the argument, FF/EMT Remeikis yelled, "you're out of the fucking skin (firehouse fund)!" *Id.*

*vi.    Administrative History*

Then, nearly ten years after Plaintiff filed the 2013 Charge, the EEOC issued a right-to-sue

letter on February 9, 2023.  (ECF No. 29-8). Indeed, Plaintiff filed the 2013 Charge on May 16,

2013.  (ECF No. 29-6). Defendant filed its Position Statement on August 7, 2013.  (ECF No. 29-

7).  Then Plaintiff received a right-to-sue letter on February 7, 2024, which says the following,

> Because you filed the above charge with the Equal Employment Opportunity
> Commission, and more than 180 days have elapsed since the date the Commission
> assumed jurisdiction over the charge, and no suit based thereon has been filed by
> this Department, and because you have specifically requested this Notice, you are
> hereby notified that you have the right to institute a civil action under Title VII of
> the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the
> abovenamed respondent.
>
> If you choose to commence a civil action, such suit must be filed in the appropriate
> Court within 90 days of your receipt of this Notice.  If you cannot afford or are
> unable to retain an attorney to represent you, the Court may, at its discretion, assist
> you in obtaining an attorney.

(ECF No. 29-6 at 3). The Court cannot discern from the record when Plaintiff sought a right-to-

sue letter or why he waited almost ten years to do so.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  The moving party can make such a showing by demonstrating

the absence of any genuine dispute of material fact or by showing an absence of evidence to

support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  A

dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp.

3d 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Therefore, if there are factual issues "that properly can be resolved only by a finder of fact because

[those issues] may reasonably be resolved in favor of either party[,]" then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250.

"When ruling on a motion for summary judgment, the [C]ourt must construe the facts alleged in the light most favorable to the party opposing the motion." *U.S. ex rel. James Commc'n, Inc. v. LACO Elec., Inc.*, No. DKC 14-0946, 2015 WL 1460131, at *2 (D. Md. Mar. 27, 2015) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008)). A party bearing the burden of proof on a particular claim must factually support each element of his or her claim. *Celotex*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Id.*

## III.    DISCUSSION

### A.    There is No Evidence that Would Allow the Court to Conclude that Plaintiff's Claim is Barred by Laches as a Matter of Law.

Defendant first argues that Plaintiff's claims are barred by the doctrine of laches.[5] (ECF No. 29-1 at 9). "Laches is an equitable doctrine, which requires a party to demonstrate that it was prejudiced by the opposing party's lack of diligence." *EEOC v. Lockheed Martin Glob. Telecomm., Inc.*, 514 F.Supp.2d 797, 801 (D. Md. 2007). It is well settled that the doctrine of laches may bar a Title VII suit. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424–425, (1975) (concluding that when a defendant is prejudiced by an unexcused delay by a private plaintiff, the district court has the discretionary power to effectuate "a just result."); *Equal Employment Opportunity Commission v. American Nat'l Bank*, 574 F.2d 1173, 1175–1176 (4th Cir.), *cert. denied,* 439 U.S.

---

[5] Although the briefs raise an issue of whether Defendant waived the defense of laches, review of the Answer confirms that Defendant properly pled laches as its eleventh affirmative defense. Moreover, Rule 12 does not require a defendant to raise the defense of laches in its first responsive pleading. *See* Fed. R. Civ. P. 12. Therefore, the Court will consider Defendant's laches defense.

876 (1978); *Boone v. Mechanical Specialties,* 609 F.2d 956, 959 (9th Cir.1979) ("We hold that laches may be used as a defense to a Title VII action.").

To succeed on a laches defense, a defendant bears the burden to prove "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990). A lack of diligence "exists where 'the plaintiff delayed inexcusably or unreasonably in filing suit.'' *Id.* (quoting *Nat'l Wildlife Fed'n v. Buford*, 835 F.2d 305, 318 (D.C. Cir. 1987)). Thus, "[a]n inexcusable or unreasonable delay may occur only after the plaintiff discovers or with reasonable diligence could have discovered the facts giving rise to his cause of action." *Id.* (collecting cases). However, "[t]he passage of time, alone, does not *ipso facto* give rise to a successful laches defense." *Al-Sabah v. World Bus. Lenders, LLC*, Civil Case No. SAG-18-2958, 2020 WL 3868989, at *13 (D. Md. July 9, 2020). Indeed, time is "one of many circumstances" informing the fact-dependent determination of whether a delay is inexcusable or unreasonable. *Buxton v. Buxton*, 363 Md. 634, 645 (2001). Moreover, "[w]hen evaluating the reasonableness of a delay, courts are reluctant to penalize plaintiffs who have simply waited for the EEOC (or its state counterpart) to act." *Westmoreland v. Prince George's Cty.*, No. CIV.A. TDC-14-0821, 2015 WL 996752, at *14 (D. Md. Mar. 4, 2015) (citing *Holsey v. Armour & Co.*, 743 F.2d 199, 211 (4th Cir. 1984)). The prejudice necessary to prevail on a laches defense includes is "generally held to be anything that places [the employer] in a less favorable position." *Parker v. Bd. of Elec. Supervisors*, 230 Md. 126, 130-31 (1962). Nevertheless, "prejudice must arise from and be assessed with respect to the facts of each individual claim." *EEOC v. Ches. & Ohio R.R. Co.,* 577 F.2d 229, 234 (4th Cir. 1978).

Several laches employment discrimination cases shed light on certain nuances the parties do not address. In *Pande v. Johns Hopkins University*, this Court held that a ten-year delay

"between the filing of [the plaintiff's] discrimination charge and the filing of the instant lawsuit" was inexcusable as a matter of law. *Pande v. Johns Hopkins Univ.*, 598 F. Supp. 1084, 1087 (D. Md. 1984). There, the plaintiff argued that his delay was excusable because he relied on the EEOC to resolve his claims. *Id.* However, the Court noted that he was represented by counsel at the outset of filing his EEOC charge and "was aware of his right to secure a right-to-sue letter upon request." *Id.* Moreover, the plaintiff chose to leave the country for a significant portion of the delay, and as a doctor, he was "highly educated." *Id.* On the issue of prejudice, the Court concluded that "changes in personnel, the effect of the passage of time on memories, the change in administration and the loss or destruction of relevant documents" all supported a conclusion that the defendant was prejudiced by the delay. *Id.* at 1089. Therefore, the Court dismissed the action under the doctrine of laches. *Id.*

By contrast, this Court concluded that a delayed suit did not "rise to the level of unreasonable delay in the laches context" when a plaintiff filed a lawsuit within ninety days of receiving a right-to-sue letter and "undertook numerous actions to protect his rights, including filing grievances and appeals at work, and filing multiple charges with the EEOC…" *Bales v. Maryland Jud./Admin. Off. of the Cts.*, Civil No. 15-cv-03293-JFM, 2016 WL 6879902, at \*11 (D. Md. Nov. 22, 2016). There, the delay was only a few years. *See id.* On the issue of prejudice, the Court concluded there was not a "substantial prejudice to a defendant's ability to defend itself." *Id.* The Court reasoned that "[t]here is no suggestion here that files or evidence relevant to this case have been 'discarded, destroyed or irretrievably dispersed.'" *Id.* (quoting *Pande*, 598 F.Supp. at 1088). Therefore, the Court concluded that even if the plaintiff should have brought suit earlier, the plaintiff "did not unreasonably delay in filing his complaint in a manner that substantially prejudiced the [defendant]." *Id.*

To that end, the parties posit opposing positions with only rare citations to the record or employment discrimination cases that considered the issue of laches. Plaintiff insists that the delay was caused not by Plaintiff, but instead by an administrative backlog. (ECF No. 34 at 10). Like in *Bales*, Plaintiff made multiple internal complaints at work in addition to his EEOC Charge. *Bales*, 2016 WL 6879902, at *11. Defendant does not point to any support for its position that an administrative backlog had no influence on the delay in the record and instead insists that the mere presence of a ten-year delay must be caused by a lack of diligence and result in prejudice. (ECF No. 29-2 at 8). By that same token, Plaintiff provides little evidentiary support of his position that the delay was no fault of his own. (ECF No. 34 at 10). In its reply, Defendant elaborates, but again without much support in the record. (ECF No. 39 at 4). There, Defendant asserts it was "Plaintiff's choice and dilatoriness that let this matter sit and languish for almost ten (10) years until eventually requesting a [right-to-sue letter]," this time citing to the two EEOC documents— the EEOC Charge and right-to-sue letter, which indicates that Plaintiff requested the letter. *Id.* (citing ECF Nos. 29-6, the EEOC Charge, 29-8). In sum, the Court is presented with a word-versus-word scenario on the question of whether the delay was inexcusable or unreasonable. Of course, such an inquiry is only one part of a laches defense. *Pande*, 598 F.Supp. at 1088.

In the Court's view, and based on the arguments presented, the Court recognizes that the issue of an unreasonable and inexcusable delay is a close question, but even if there is an unreasonable delay for the purposes of laches, there is not support for the kind of prejudice necessary to bar Plaintiff's suit. On the issue of delay, a ten-year delay is certainly significant. *Pande*, 598 F. Supp. at 1086. However, unlike the plaintiff in *Pande*, Plaintiff here was not a highly educated doctor who was represented by counsel during his hearings and out of the country for a significant portion of the decade. *See id.* Moreover, time is just one of many circumstances.

11

*Al-Sabah*, 2020 WL 3868989, at *13. Indeed, Plaintiff has represented that the delay was at least partially influenced by Plaintiff's dependence on the EEOC, and it is clear from the record that Plaintiff did retain counsel and file his lawsuit by May 8, 2024, which is ninety-one days after the EEOC issued the February 7, 2024, right-to-sue letter.[6] Considering this Court's reluctance to penalize a plaintiff for delays caused by the EEOC and notable differences between this case and *Pande*, this Court is reluctant to conclude that a ten-year delay alone is enough to bar Plaintiff's case in the employment discrimination context. *Westmoreland*, 2015 WL 996752, at *14; *Holsey v. Armour & Co.*, 743 F.2d at 211; *Pande*, 598 F.Supp. at 1086. Defendant offers no other argument in support of a finding to the contrary.

However, even if the Court were to find that the delay was unreasonable and inexcusable, it cannot be said that this case presents the kind of prejudice necessary to bar a case. *Bales*, 2016 WL 6879902, at *10 (indicating there "must be a clear showing of substantial prejudice to the defendant's ability to defend itself"). Here, Defendant argues only that the passage of time and staff changes create undue prejudice. This is the precise argument that failed in *Bales* at the motion to dismiss stage. *Bales*, 2016 WL 6879902, at *11. Indeed, Defendant posits—without explaining how—that because fourteen out of twenty-three "people who managed the 2013 investigation…are no longer with BCFD," that "[t]his would be very prejudicial to Defendant." (ECF No. 39 at 4-5). While it is conceivable that memories may fade, *Bales* concluded that such an obstacle is not enough to support a conclusion of undue prejudice. *See Bales*, 2016 WL 6879902, at *11. Without more, it is unclear how these retirements or other change in profession could result in the kind of prejudice a laches defense requires. *Id.* Here, like in *Bales* Defendant does not suggest that there

---

[6] It is unclear when Plaintiff received his right-to-sue letter compared to the February 7, 2024, right-to-sue date. Defendant does not challenge whether Plaintiff's suit has been timely filed with regard to the allegations set forth in the EEOC charge from 2013.

exist certain files or other evidence relevant to this case that has been "discarded, destroyed, or irretrievably dispersed" or that any particular former employees cannot be located. *Id.* (quoting *Pande*, 598 F. Supp. At 1088). To the contrary, discovery concluded on August 29, 2025 (ECF No. 27), and Defendant provided the Court with hundreds of documents in support of its motion for summary judgment. (ECF Nos. 29, 39). Defendant does not point to any outstanding discovery that it requires but cannot obtain due to the passage of time. Moreover, it is unclear how Defendant could be prejudiced from defending itself when discovery yielded such a great number of documents that Defendant could file a motion for summary judgment substantive and procedural issues in this case. *See id.* Therefore, a finding that laches bars the case as a matter of law would be improper here. Thus, Defendant's Motion for Summary Judgment (ECF No. 29) is DENIED on this issue.

### B.    Administrative Exhaustion & Timeliness

Defendant next argues that Plaintiff "is precluded from bringing suit for the alleged discriminatory and/or retaliatory acts set forth in his Complaint for which Plaintiff failed to make a complaint with the EEOC." Based on the Court's review of the EEOC Charge, Plaintiff reported (1) the January 2013 phone call between FF Snyder and Plaintiff; (2) the January 2013 dinner-plate altercation; (3) the 2009 turnout gear incident; and (4) a 2010 incident in which Plaintiff was "charged with being 'un-trainable.'" (ECF No. 29-6). Thorough review of the record shows that these incidents each involved related facts that were not all specified in the EEOC Charge.

To that end, Defendant makes three administrative exhaustion arguments. First, Defendant posits that the allegations from the transfer approval requests in June (FF/EMT Remeikis approved), August (Plaintiff disapproved), and December (Plaintiff approved for second choice) must be dismissed because they "allegedly occurred after the date Plaintiff filed his May 16, 2013, EEOC charge" (ECF No. 29-2 at 9). Second, Defendant posits that each of the allegations that

occurred prior to July 20, 2012, must be dismissed because they occurred before the 300-day deadline by which to file an EEOC Charge.  (ECF No. 29-3 at 10).  Third, Defendant posits that the following allegations in the Complaint must be dismissed for failure to include them in the EEOC Charge: (1) a January 2, 2013, suspension without pay; and (2) a disciplinary letter that claimed Plaintiff did not use a stretcher to transport a patient in September of 2012. (ECF No. 1 at 8).

               1.      <u>A Plaintiff Need Not File an Additional EEOC Charge Alleging Retaliation for Filing an EEOC Charge, and Plaintiff's Transfer Allegations Will Not be Dismissed for Failure to Exhaust for the Purposes of his Retaliation Claim.</u>

It is well taken that the Complaint does not make clear which allegations purportedly support each respective claim.  The standards for administrative exhaustion differ between racial discrimination, hostile work environment, and retaliation claims.  *See, e.g., Cosens-Wagaman v. Maryland Dep't of Pub. Safety and Corr. Servs.*, Civil Case No: 1:23-cv-01953-JMC, 2025 WL 2978422, at *8 (D. Md. Oct. 22, 2025) ("What a plaintiff must include in an EEOC charge of retaliation differs slightly from what a plaintiff must include in an EEOC charge of discrimination.").  In *Nealon v. Stone*, the Fourth Circuit resolved the question of "whether a plaintiff asserting a Title VII claim of retaliation for filing a previous EEOC charge must exhaust administrative remedies before suing in federal court."  *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992). Indeed, under the "relation-back" rule, "once a party has properly filed an EEOC charge for discrimination, she is not required to file a new charge for retaliation that is related to claims made in the initial charge."  *Plunkett v. Potter*, 751 F.Supp.2d 807, 811 (D. Md. 2010).  As this Court has recognized, *Nealon* made clear that a plaintiff's failure to allege retaliatory acts in an EEOC Charge will not bar a lawsuit alleging that those same acts were retaliation for filing a previous EEOC Charge.  *Cosens-Wagaman*, 2025 WL 2978422, at *8; *see also  Tonkin v. Shadow*

*Management, Inc.*, 605 Fed. App'x 194, 194 (4th Cir. 2015) (concluding that the district court properly dismissed retaliation claims when the plaintiff had knowledge of the factual basis for her retaliation claim before she filed a charge with the EEOC); *Dickerson v. Mack Trucks, Inc.*, Civil No. WDQ-12-2593, 2013 WL 3507508, at *3-*4 (D. Md. July 10, 2013) (reasoning that Nealon did not excuse a plaintiff's failure to exhaust administrative remedies because his termination occurred before he filed his EEOC charge).

This Court considered a similar scenario to that presented here in *Cosens-Wagaman*. There, as here, plaintiff brought an action under Title VII alleging a hostile work environment and retaliation for multiple instances of alleged discrimination.[7] *Cosens-Wagaman*, 2025 WL 2978422, at *1-*2. Additionally, the plaintiff there was not fired after filing her first EEOC charge, "meaning as a matter of policy, that it was possible workplace retaliation could continue after filing the First Charge." *Id.* at *9. Critically, the allegations in *Cosens-Wagaman* that took place after the plaintiff filed her first and amended EEOC charges "ma[de] clear that the retaliatory acts had not occurred in full at the point of filing…" *Id.* Therefore, the Court reasoned that even though the plaintiff there seemed to have had knowledge of some of her selective discipline allegations by the time she filed her amended charge, the record did not contain enough facts to "infer either act was unrelated to filing" with the EEOC. *Id.*

The situation here is even clearer than that in *Cosens-Wagaman.* Here, Plaintiff filed only one EEOC charge and could not possibly have had knowledge of the transfers because they had not yet occurred when he filed with the EEOC. (ECF No. 29-6, 29-11). Moreover, as articulated in greater detail below, there is no suggestion anywhere in the record that would allow the court to infer that the BCFD's choice to disapprove Plaintiff's transfer requests (and later preferred

---

[7] The plaintiff there brought claims alleging sex discrimination rather than race discrimination. *Cosens-Wagaman*, 2025 WL 2978422, at *1.

transfer request, as Plaintiff puts it) but approve FF/EMT Remeikis's request was unrelated to Plaintiff's May 2013 EEOC Charge, which alleged that the BFD engaged in racial discrimination against Plaintiff with explicit reference to FF/EMT Remeikis. *Cosens-Wagaman*, 2025 WL 2978422, at *9. Based on the Court's review of the record, a jury could reasonably conclude that the selective transfer approvals were retaliation for Plaintiff's choice to file an EEOC charge based on the January 2013 dinner-plate altercation. Moreover, Defendant does not point to any case law that supports a finding to the contrary.

Based on the analysis above, for the purposes of retaliation only, summary judgment will accordingly be DENIED such that the aforementioned acts may support Plaintiff's retaliation claim, namely Plaintiff's two transfer requests and the Defendant's decisions regarding each in contrast to its decisions regarding FF/EMT Remeikis's transfer request following the January 2013 dinner plate incident.

      2.    <u>It is Settled that Otherwise Untimely-Filed Allegations that Make Up a Hostile Work Environment May Nonetheless Be Considered Pursuant to the Continuing Violation Doctrine</u>

Defendant correctly asserts that a plaintiff must exhaust his administrative remedies by filing a timely charge with the EEOC. *Radbod v. Washington Suburban Sanitary Comm'n.*, No. Civ. JFM–03–309, 2003 WL 21805288, at *2 (D. Md. July 14, 2003). Plaintiff relies on *National R.R. Passenger Corp. v. Morgan* in support of his position that the allegations starting as early as 2009 are all part of a continuing course of conduct, for which the 2013 EEOC Charge and related conduct "serve as an anchor for the entirety of the hostile work environment claim, [thereby] allowing the [C]ourt to consider the full history of harassment dating back to 2009." (ECF No. 34 at 9) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Defendant urges that these acts are discrete, thereby necessitating a conclusion that those events that took place in

2009 and 2010 were not timely filed in the 2013 EEOC Charge as a matter of law.  (ECF No. 29-2 at 10-11).

As to discrete discriminatory acts, this issue has been settled.  In *Morgan*, the Supreme Court explained that "discrete discriminatory acts are not actionable if time barred, even when they are related to the acts alleged in timely filed charges."  *Morgan*, 536 U.S. at 114.  The Court specified that discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire" and are "easy to identify."  *Id.*  However, affirming the Ninth Circuit's conclusion that the hostile work environment claims alleged a continuing violation, the *Morgan* Court noted that unlike claims for discrete acts, a hostile work environment occurs "over a series of days or perhaps years…"  *Id.* Thus, under Title VII, "[i]t does not matter…that some of the component acts of the hostile work environment fall outside of the statutory time period…[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile work environment may be considered by a court for the purpose of determining liability."  *Id.* at 117. Post-*Morgan*, "even if most of the harassing conduct on which a plaintiff relies to establish [his] hostile work environment claim occurred outside the statutory period, the claim will be considered timely if at least one act continuing the violation occurred within the statutory period." *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 222 (4th Cir. 2016).  Thus, the "continuing violation doctrine applies to a hostile work environment claim." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 209 (4th Cir. 2019) (citing *Morgan*, 536 U.S. at 116–17, *Guessous*, 828 F.3d at 223 n.5).  In order to file a timely EEOC charge, "the employee need only file a charge within...300 days of *any* act that is part of the hostile work environment." *Morgan*, 536 U.S. at 118 (emphasis added).

Accordingly, the Court will consider both the 2009 "turnout gear" incident and the 2010 comment that Plaintiff was "untrainable" in its substantive evaluation of Plaintiff's underlying hostile work environment claim. Therefore, summary judgment based on untimeliness and failure to exhaust is DENIED to the extent those acts they will be considered under Count II (hostile work environment). They shall not, however, be considered by the Court is its substantive evaluation Plaintiff's other claims.

3.     <u>The Court Will Not Disregard Allegations in the Complaint that Refer to a September 7, 2012 Discipline Letter and January 2, 2013, Suspension Because It is Reasonably Related to His EEOC Charge</u>

Even when a plaintiff has properly exhausted the administrative process, he is barred from bringing Title VII claims that "exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof ...." *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995). "The exhaustion requirement ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible." *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 384 (4th Cir. 2022) (quoting *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005)). Of course, the EEOC charge "generally operate[s] to limit the scope of any subsequent judicial complaint." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005). Indeed, "the factual allegations made in formal litigation must correspond to those set forth in the administrative charge." *Id.* Because EEOC charges are often brought "by those unschooled in the technicalities of formal pleading" and should be construed with the "utmost liberality." *Hart v. Broadway Servs., Inc.*, 899 F. Supp. 2d 433, 440 (D. Md. 2012) (quoting *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 848 F.2d 457, 460 (4th Cir. 1988)). Thus, "[a] federal court may hear a claim that was not presented to the EEOC so long as it is reasonably related to plaintiff's EEOC charge and can be expected to follow from a reasonable administrative investigation." *Faulkenberry v. U.S. Dep't of Defense*, 670 F. Supp. 3d 234, 252 (D. Md. 2023).

Here, the five-day January 2013 suspension resulting from the September 7, 2012 stretcher incident is reasonably related to the allegations in Plaintiff's EEOC Charge. *See id.* at 253.  Like the January 2013 dinner plate altercation allegation, the January 2013 suspension involves the same FF/EMT, Mr. Remeikis, and a similar allegation of selective discipline imposed against Plaintiff instead of FF/EMT Remeikis on the basis of race. To that extent, and considering the analysis above, the Court concludes that they are reasonably related to the allegations in Plaintiff's EEOC Charge.  Plaintiff's 2013 EEOC Charge clearly asserts that Plaintiff "worked in a hostile work environment" for "the past four years."  (ECF No. 29-6 at 3).  Plaintiff explicitly attributes certain instances of his alleged hostile work environment to FF/EMT Remeikis in January 2013. *Id.* It follows that a reasonable investigation would discover a preceding instance of selective discipline involving Plaintiff and FF/EMT Remeikis that also took place in January 2013, as related to their September 7, 2012, conflict.  As such, the Court applying the "utmost liberality," declines to penalize Plaintiff for failure to include a reasonably related allegation of a hostile work environment by disregarding the 2012 stretcher incident and subsequent discipline from the Court's substantive analysis.

By rejecting, in part, Defendant's arguments regarding timeliness, exhaustion of remedies and scope, the Court is merely making clear that it will not exclude these incidents in its substantive analysis of each count in the Complaint.  As will be discussed in more detail below however, consideration of these incidents does not make each of the counts substantively viable.

### C.    Recent Fourth Circuit Precedent Precludes Summary Judgment on Plaintiff's Race and Color Discrimination Claims (Counts I, IV, V).

Turning now to Defendant's substantive arguments, Defendant urges this Court to grant summary judgment because "Plaintiff has no evidence to show that any of the discipline or investigations undertaken by Defendant were based on his race or his color."  (ECF No. 29-2 at

11). Title VII prohibits an employer from "discharg[ing] any individual, or otherwise ... discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C § 2000e–2(a); *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). A plaintiff may establish a claim of employment discrimination under Title VII through one of two avenues of proof. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007); *see also Foreman v. Weinstein*, 485 F. Supp. 2d 608, 612 (D. Md. 2007). First, a plaintiff may establish through direct or circumstantial evidence that his race motivated an employer's adverse employment action. *Holland*, 487 F.3d at 213; *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996). Second, under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case of discrimination. *Lettieri v. Equant Inc.*, 478 F.3d 640, 646 (4th Cir. 2007). "To do so, a plaintiff must show that (1) [he] is a member of a protected class; (2) [his] employer took an adverse action against her; (3) [he] had been fulfilling her employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination[.]" *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649–50 (4th Cir. 2021). "Once a plaintiff makes out a prima facie case, the burden shifts to the employer to put forth a nondiscriminatory explanation for its actions." *Id.* at 650. "If the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation was actually a pretext for discrimination." *Id.* Here, Plaintiff seeks to proceed under the *McDonnell Douglas* framework.

To begin, Plaintiff brings three claims predicated on allegations of adverse action resulting from race and color discrimination. In Count I, Plaintiff alleges a violation of Title VII based on racial discrimination; in Count IV, Plaintiff alleges a violation of 42 U.S.C. § 1981 through 42

U.S.C. §1983; and in Count V, Plaintiff alleges a violation of The Maryland Fair Employment Practices Act (MFEPA), Md. Code Ann., State Gov't, § 20-601 *et seq*. (ECF No. 1).  Courts apply the Title VII *McDonnell Douglass* burden shifting framework to discrimination, retaliation, and harassment claims brought under the MFEPA and § 1981. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) ("This framework was initially developed for Title VII discrimination cases ... but has since been held to apply in discrimination cases arising under § 1981.") (internal citations omitted); *Passwaters v. Wicomico Cnty.*, No. RDB-18-2923, 2019 WL 6341623, at *8 (D. Md. Nov. 27, 2019) ("The same framework governs Plaintiffs' Title VII and S.G. § 20-606 claims.").  Therefore, each of the aforementioned counts are subject to the analysis below.

Defendant urges that "Plaintiff has no evidence to show that any of the discipline or investigations undertaken by Defendant were based on his race or his color" and "Plaintiff has offered no more than his subjective beliefs." (ECF No. 29-2 at 13).  Plaintiff's brief largely focuses his racial discrimination claim on the discipline that followed the January 2013 dinner-plate altercation. (ECF No. 34).  In addition, Plaintiff argues that his suspension without pay in 2009 and transfer request decisions in 2013 constitute additional adverse employment actions connected to his racial discrimination claim.  (ECF No. 34 at 12).[8]  Based on the analysis *supra* Section

---

[8] Regarding any other existing allegations in the Complaint that Plaintiff does not argue fall under the racial discrimination claims but may seek to explore at trial, the Court observes that instances of FF Snyder's rude phone call, and the 2009 turnout gear incident are not actionable adverse employment actions for the purposes of a racial discrimination claim. *See Holland*, 487 F.3d at 219. "Although conduct short of ultimate employment decisions can constitute adverse employment action, there still must be a tangible effect on the terms and conditions of employment." *Geist v. Gill/Kardash P'ship*, 671 F.Supp.2d 729, 737 n. 6 (D.Md.2009). "Title VII does not remedy everything that makes an employee unhappy." *Jeffers v. Thompson*, 264 F.Supp.2d 314, 329 (D.Md.2003); *see also De La Torre v. Fink*, No. PX-23-3202, 2025 WL 460757, at *7 (D. Md. Feb. 11, 2025) (recognizing that a low performance score is an adverse employment action because it is tied to future compensation or employment opportunities). Here, there is no evidence that these kinds of remarks or otherwise unpleasant conduct Plaintiff faced at the workplace resulted in a "tangible effect on the terms and conditions" of Plaintiff's employment or risked impacting his future employment opportunities. Therefore, they will not be part of Plaintiff's racial discrimination claim. Turning to the 2010 incident in which Plaintiff was "charged with being 'un-trainable,' aside from a reference to this issue in the 2013 Charge, there is no evidence Plaintiff offers to show why he received such a charge, what it meant, or that it was motivated by

III.B.1., although the transfer allegations may be considered as part of Plaintiff's *retaliation* claim, they were not properly exhausted such that they may be applied to a *racial discrimination* claim because Plaintiff failed to file an EEOC charge to that effect.  Looking at the suspension without pay allegations from 2009, a suspension does constitute an adverse employment decision. *Holland*, 487 F.3d at 219.  However, the record concerning this event is entirely unclear. The briefs suggest that the disputed suspension arose from an event where Plaintiff was "arrested for wielding a knife." (ECF No. 39 at 9); (ECF No. 39-2).  A police report included in Defendant's reply indicates a witness found Plaintiff and Mr. Shaffer at work.  (ECF No. 39-2).  When the witness entered the room, "[Plaintiff] was standing in front of a lounge chair about five feet away [from Mr. Shaffer]…[Plaintiff]had a knife and was waiving it in an unsafe manner at Mr. Shaffer yelling and cursing at Mr. Shaffer who had his back against the weight room door located in the rear of the station." *Id.* at 2.  There is no evidence to the contrary, let alone any evidence showing that such a resulting suspension from this kind of an event gives rise to an inference of unlawful discrimination.  *See Magassouba v. Prince George's Cnty.*, 773 F. Supp. 3d 196, 217 (D. Md. 2025) (granting summary judgment on a racial discrimination claim when a plaintiff failed to "establish[] any causal connection between [an employee's] alleged derogatory comments and the adverse employment actions).

Contrary to Defendant's arguments, the Court views Plaintiff's arguments concerning the dinner-plate altercation differently.  However, the undisputed facts show that (1) Plaintiff is a member of a protected class, (2) he engaged in a dispute with two white colleagues at work; (2) he was disciplined thereafter; and (4) his white counterparts were not.  (ECF Nos. 29-12, 29-13, 29-14, 29-15).  As Plaintiff points out, establishing a prima facie case is not an onerous task, and it

---

a racial animus. Therefore, considering the lack of evidence concerning the 2010 allegation, that too will not be part of the racial discrimination claim.

may be established by temporal proximity. *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (concluding that when a plaintiff relied on a seven-month temporal proximity in addition to allegations of continued retaliatory conduct and animus directed at her supported a causal link). Here, the Court will assume for the purposes of this analysis that Plaintiff has met the low bar of stating a prima facie case. *See Holland*, 487 F.3d at 214.

In response, Defendant has generated evidence by way of the hearing documents that Plaintiff was disciplined because he was the aggressor in the dinner plate incident, and department policy justified his discipline. (ECF Nos. 29-12, 29-13, 29-14, 29-15). Though stated differently, it seems that Plaintiff points to Defendant's policies in support of a selective-enforcement argument to show a pretext. (ECF No. 34 at 20) ("Defendant's pretextual claim that it was 'simply following its own policy' is belied by the evidence. The policy was weaponized against Plaintiff in retaliation for his complaints, while his white colleagues violated it with impunity.").

Thus, the issue of disparate treatment of similarly situated comparators warrants some consideration. When a plaintiff "attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination, the plaintiff must demonstrate that the comparator is similarly situated in all relevant respects." *Williams-Johnson v. Paris Foods Corp.*, Civil Action No. RDB-24-1197, 2025 WL 775513, at *5 (D. Md. Mar. 10, 2025) (internal quotations omitted). This includes evidence "that the employees 'dealt with the same supervisor, [were] subject to the same standards and...engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). However, "no single comparator" must "perfectly align[] with every incident…" because "the analysis does not require

a perfect one on one fit." *Johnson v. Baltimore City, Md.*, 163 F.4th 808, 817 (4th Cir. 2026). "Instead, the analysis focuses on the 'similarity between [the] comparators' and their conduct such that a jury could reach an inference of discrimination, so long as the comparison is 'meaningful.'" *Id.* (quoting *Lightner v. City of Wilington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008)) (alterations in original).

In *Johnson v. Baltimore City, Maryland*, the Fourth Circuit concluded that a complaint sufficiently alleged "sufficient facts to demonstrate similar comparators so as to allow for a reasonable inference as to their similarities to [the plaintiff]" when all comparators were Baltimore police officers and were therefore "subject to the same standards." *Id.* Here, the evidence shows that like in *Johnson*, while Plaintiff, FF/EMT Remeikis, FF Snyder, and PO Wenger were all subject to the same standards because they all shared similar positions at the BCFD, and none of the white employees involved in the dinner plate dispute had supervisory authority. *Id.* Turning to the alleged conduct in *Johnson*, the Fourth Circuit reversed the District Court's decision to dismiss the complaint on the issue of whether their conduct was sufficiently similar. *Id.* Where the District Court concluded that there could be no inference of unlawful discrimination because none of the comparators "were accused of and found guilty following a trial board of misconduct similar to [the plaintiff]," the Fourth Circuit reasoned that a "perfect one-to-one match" is not necessary. *See id.* There, because the plaintiff was "charged with misconduct for assault, failing to notify her supervisors of assault, and making false statements" and "at least six other officers who were charged with assault and seven others who allegedly made false statements" were not terminated, those allegations were sufficient to state a claim for discrimination. *Id.* In other words, in the context of the claim brought here, it did not matter that those other comparators had not been "accused and found guilty following a trial board of misconduct." *See id.*

The scenario here does present some minor differences from *Johnson*. First, the procedural posture at the pleading stage, where "a full analysis of whether comparators are similarly situated does not necessarily occur at the motion-to-dismiss stage," and "a plaintiff must still plead sufficient facts to justify an inference that the employer treated the plaintiff differently from the way it treated others under 'arguably similar circumstances.'" *Tittle v. Petro*, Civ. No. TDC-24-3061, 2025 WL 1920936, at *6 (D. Md. July 11, 2025) (quoting *Woods v. City of Greensboro*, 855 F.3d 639, 651 (4th Cir. 2017)). Second, the allegations the Fourth Circuit determined to be sufficiently similar so as to support an inference of unlawful discrimination each concerned separate instances in which certain white police officers' assaults, failures to notify, and false statements were ignored, and plaintiff's were not. *Johnson*, 163 F.4th at 817. Here, the conduct instead concerns that of multiple firefighters and the Defendant's subsequent treatment of each of them as it relates to their involvement in the same fight. Recognizing that differences between this case and *Johnson* exist, the Court is nevertheless satisfied that *Johnson* precludes summary judgment.

Here, despite Defendant's conclusion that Plaintiff was the aggressor, it is clear from the record that FF/EMT Remeikis and PO Wenger were equally involved in the verbal altercation that ensued. (ECF No. 29-6 at 3). While there is no evidence that they too threw items at Plaintiff, and in consideration of *Johnson*, the Court is mindful that their statements, aggression, use of profanity, and decisions to enter the conflict could very well have warranted equal discipline under Defendant's policies. *Johnson*, 163 F.4th at 817; (ECF No. 29-14) (describing the dinner-plate altercation in great detail). It is not as though the evidence shows they were innocent bystanders. Nevertheless, Defendant concluded that Plaintiff's resulting complaints were meritless, and PO Wenger's and FF/EMT Remeikis's were not. (ECF No. 29-16 at 6-7) (dismissing each of

Plaintiff's complaints but substantiating an assault in insubordination complaint against Plaintiff).

Defendant certainly could have concluded that each complaint had some merit and warranted some

level of discipline to each member involved in the altercation.  Thus, a reasonable jury could find

that the Defendant's policy defense is a mere pretext for discrimination.  *See id.* Therefore, the

Court concludes that Plaintiff has met its burden necessary to defeat summary judgment under the

*McDonell Douglas* test.

Defendant's Motion for Summary Judgment with respect to Counts I, IV, and V is therefore

DENIED on the narrow grounds that Plaintiff may pursue the racial discrimination claims based

on selective enforcement of discipline policies following the dinner plate altercation only.

Otherwise, summary judgment is GRANTED.

### D.    There is No Genuine Issue of Material Fact Concerning Plaintiff's Hostile Work Environment Claim (Count II).

Defendant next moves for summary judgment under Count II, Plaintiff's hostile work

environment claim. "The elements of a Title VII claim for hostile work environment are: '(1)

unwelcome conduct; (2) that is based on [a protected status]; (3) which is sufficiently severe or

pervasive to alter...conditions of employment and to create an abusive work environment; and (4)

which is imputable to the employer.'" *Milo v. CyberCore Techs., Inc.*, No. RDB-18-3145, 2019

WL 4447400, *5 (D. Md. Sep. 17, 2019) (quoting *Strothers v. City of Laurel*, 895 F.3d 317, 328

(4th Cir. 2018)) (other citation omitted).  To that end, Defendant argues each element fails.  (ECF

No. 39 at 13) (emphasis omitted).  The Court is primarily concerned with the second and third

elements, as there is clear evidence that these actions were unwelcome, and that his supervisors

knew about them based on his complaints.[9]

---

[9] Further, it is undisputed that Plaintiff complained of the alleged discrimination to his supervisor on multiple occasions.  *See Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333–34 (4th Cir.2003) (en banc) ("[T]he employer

1.    There is No Evidence That the Alleged Acts Underlying the Hostile Work Environment Claim were Based on Race

Plaintiff's alleged hostile work environment claim is made up of five primary instances of conduct: (1) the 2009 incident in which Plaintiff found his "turnout" gear in the ceiling; (2) the 2010 incident in which Plaintiff was charged with being "un-trainable"; (3) the January 2013 events in which Plaintiff was suspended because he did not use a stretcher during a fire; (4) the January 2013 phone call from FF/Snyder during which he told Plaintiff, "you're not Engine 13 material and you have to go"; and (5) the January 2013 soiled dinner plate altercation. *See* (ECF Nos. 1; 29-6). Plaintiff emphasizes only the 2009 turnout gear incident and 2013 dinner plate altercation and the statements made in connection to each of those instances in his brief.[10] (ECF No. 34 at 16). Plaintiff further alleges the soiled dinner plate altercation involved threats and the use of a racial slur, by way of calling Plaintiff a "lil' boy."

Starting with Plaintiff's argument that there is evidence that the "lil' boy" was used as a racial epithet, it is true that the use of the word "boy" in reference to African-American employees can, in certain circumstances, be probative of racial discrimination. *Evans v. Coates Elec. Instrumentation Inc.*, Case No. 2:16–cv–01196–DAK, 2017 WL 2543933, at *2 (D. Utah June 12, 2017) ("Because use of the term "boy," even without modifiers, is potentially probative of discrimination…"). In *Ash v. Tyson Foods, Inc.*, the Supreme Court recognized that "[a]lthough it is true [the word "boy"] will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006).

---

may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it.").

[10] Plaintiff often cites to his deposition, which in several instances contains new allegations, not contained in the EEOC charge or subject of the administrative exhaustion arguments set forth *supra* Section III.B. Therefore, the Court will not consider them pursuant to *supra* Section III.B.3.

Therefore, "[t]he speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." *Id.*

Here, the context is as follows:

On January 20th 2013 at approximately 1440 hours, I entered the quarters of Engine 13… EMT/FF Remeikis entered the kitchen, stood at the doorway, looked directly at me and said "hey! That plate you had ... it's back in your locker!". I looked at him and said "well, you know that don't belong in my locker!" he cut off my words by repeating "but, u left it out! U left it out for two tricks" as I repeated my before mentioned statement. EMT/FF Remeikis then abruptly changed his words and shouted "well, you don't belong in this firehouse!!" I quickly stated "I don't care what you think! I'm here and aint going anywhere!" He then repeated his statement including "you don't belong in this firehouse! Nobody wants you here! Nobody likes you! You're a bum!" In defense of my humanity, I responded with "I don't care what anyone thinks of me, I'm here! I'm not going anywhere! I do my job! You can't change that! Think what you want, you think you're perfect, you're wrong! You're not better than me, you won't make me leave!" During the exchange, PM Ronnie Atkinson attempted to give reason between us by saying "aint no need to be arguing like this ya!" I understood his reasoning, but as was attempting to walk out the kitchen door to my locker, EMT/FF continued his barrage against my personal and professional character in front of other members. He loudly repeated his before mentioned statements, now including "you're a fucking bum! Put a fucking transfer in! Sign the fucking transfer**!" I responded in my defense "I didn't leave five years ago, I'm not going anywhere now!" he then stated "oh, so you just wanna stay here to prove a point?!" I stated "I'm here because I have a fucking right to be here!!" his response was "you're gonna get someone fucking killed! See, that's your problem, you're a fucking lil boy!!" I stated "NO! If I was truly a lil boy, I would have believed what you say about me and left, but I got more pride in myself that you think and you're mad because you can't do anything about it!"** as he responded with "that's bullshit! That's fucking bullshit!"

(ECF No. 29-14 at 11-12) (emphasis added). Here, there is no evidence that the statements "you're a fucking bum!" and "…you're a fucking lil boy!!" are grounded in a racial animus. *Id.* at 12. The statements were clearly made in context of the fight Plaintiff had about the soiled plate, Plaintiff's fulfillment of his workplace responsibilities, and whether (as FF/EMT Remeikis stated immediately before the "lil boy" comment) Plaintiff was "gonna get someone fucking killed." *Id.* Moreover, there is no evidence generated, nor does Plaintiff argue, that tone, inflection, or

historical usage made Plaintiff believe the use of the term was motivated by a racial animus; rather, Plaintiff insists that the use of the word and is offense to the entire incident is enough to prove a racial animus.  (ECF No. 34 at 14) ("First Acting Lieutenant Daniel Remeikis repeatedly called Plaintiff "boy"—a deeply offensive and historically charged racial slur—while shouting at Plaintiff that "you don't belong in this firehouse.").  The evidence is simply not consistent with Plaintiff's arguments or his characterization of the record.  *Ash*, 546 U.S. at 456 (Although it is true [the word "boy"] will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign.").

In *McIver v. Bridgestone Americas, Inc.*, the Fourth Circuit considered whether there existed a genuine issue of material fact with respect to certain acts being (1) based on race and (2) whether they were severe and pervasive.  *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 408 (4th Cir. 2022). There, the allegations of discrimination included: "(1) tampering that [the plaintiff] attributes to racial animus, (2) abhorrent and explicitly racial harassment[11] that was not directed at [the plaintiff], but which she knew about, and (3) comments of racial animus made directly to her ten years or more before her claim was filed."  *Id.*  Concluding that evidence of mere tampering "is not inherently race based" without obviously racist comments or imagery, the Fourth Circuit concluded that such evidence was insufficient to support a causal link under a hostile work environment claim.  *Id.* at 409.  Indeed, "To establish that harassment was based on race, [the plaintiff] must show that but for her race, she would not have been the victim of the alleged discrimination." *Gilliam v. S.C. Dep't of Juv. Justice*, 474 F.3d 134, 142 (4th Cir. 2007) (cleaned up). Accordingly, "a plaintiff cannot rely on 'conjecture' to impute a racial character 'what appears

---

[11] The alleged "abhorrent and explicitly racial harassment" included an instance in which the plaintiff "found unexplained grease on the buffer arm of her machine and when the sidewall drum on her MTS machine was too big."  To that end, the court noted that the plaintiff "testified in her deposition that she could not recall [the accused employee] saying or doing anything racially derogatory to her."  *McIver*, 42 F.4th at 410

to be neutral harassment.'"  *McIver*, 42 F.4th at 409 (citing *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280–81 (4th Cir. 2000)).

Regarding the remaining allegations that underly the hostile work environment claim, they fail for precisely the same reasons as the allegations in *McIver*.  Here, while evidence of having turnout gear strung up in the ceiling, receiving discipline for being "un-trainable," and being told "you're not Engine 13" material would be unwelcomed, there is simply no evidence that but for Plaintiff's race, he would not have been the victim of these same acts.  *McIver*, 42 F.4th at 408-09.  Further, the evidence shows that the statements made in the dinner-plate altercation were about how Plaintiff failed to clean his dinner plate and the lack of competency his co-workers perceived. (ECF No. 29-14 at 11-12).  Therefore, because Plaintiff "fails to connect [his] tampering allegations to circumstances that imply racial animus, and [his] other allegations…were not committed by supervisors and are too remote in time to support this claim," there is no genuine issue of material fact concerning the second element of a hostile work environment claim.  *Id.* at 410.

### 2.    The Evidence is Insufficient to Prove Severe or Pervasive Abuse

Plaintiff also fails to meet the high bar to prove severe or pervasive abuse.  As the parties note, the severe and pervasive inquiry involves an objective and subjective component.  *See Faulkenberry v. U.S. Dep't of Defense*, 670 F.Supp.3d 234, 254 (D. Md. 2023).  While there is sufficient evidence of Plaintiff's subjective perception, the evidence here falls short of the high bar for what may be considered an objectively hostile work environment. "To show that harassment was severe or pervasive, a plaintiff must show that he perceived, and a reasonable person would perceive, the work environment to be abusive." *Amirmokri v. Balt. Gas and Elec. Co.*, 60 F.3d 1126, 130–31 (4th Cir. 1995) (quoting *Beardsley v. Webb,* 30 F.3d 524, 530 (4th Cir. 1994); citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)).  Indeed, a plaintiff "must clear a high

bar in order to satisfy the [objective] severe or pervasive test." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019). "[W]hen determining whether the harassing conduct was objectively severe or pervasive," a court considers "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* Thus, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* Similarly, "complaints premised on nothing more than rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008).

In *Nelson v. Crane Service Co., Inc.*, this Court denied summary judgment on this issue when the plaintiff contended "that supervisors and co-workers alike used the n-word as well as other racial epithets, such as 'monkey' and 'cookie,' both in his presence and directed at him on an almost daily basis." *Nelson v. Crane Service Co., Inc.*, Civil Action No. No. 24-cv-766-ABA, 2026 WL 118358, at *6 (D. Md. Jan. 15, 2026). In *Boyer-Liberto v. Fontainebleau Corp.*, the Fourth Circuit recognized concluded for the first time, that the use of racial epithets, even if a single incident, can be sufficiently serious enough to engender a hostile work environment when stated by a supervisor. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280-81 (4th Cir. 2015). In *McIver*, which similarly considered evidence that failed to establish a neutral harassment was based on a plaintiff's race, the Fourth Circuit further noted that "[t]he totality of [the] allegations, and the evidence put forward to support them, fails to create a genuine question of material fact that racial discrimination in [the defendant's] MTS department was so severe or

31

pervasive that it constituted a hostile work environment." *McIver*, 42 F.4th at 410.  To that end, "all of the explicitly racial conduct alleged by [the plaintiff], both directed at her and not, all occurred long ago and intermittently over seven years." *Id.*  "Moreover, the most recent instance of racial animus at [the defendant's facility] occurred more than five years before she filed this claim." *Id.*  Therefore, the court reasoned that those allegations were "simply 'too remote to be pervasive, and, thus, insufficient to create a genuine issue of material fact.'" *Id.* (quoting *Perkins*, 936 F.3d at 210).

Here, despite the Court's finding that these claims do not fail for administrative reasons such as timeliness, scope and exhaustion, the Court nonetheless concludes that each event, which happened most recently over ten years ago, is too remote to be pervasive. *Id.*  Further, considering that the five events took place over the course of a period greater than four years, and the record is devoid of the kind of evidence like that in *Nelson* involving racial epithets directed at the plaintiff in his presence on an almost daily basis, the evidence hardly supports a conclusion that Plaintiff was subjected to pervasive harassment. *Nelson*, 2026 WL 118358, at *6.  While Plaintiff was clearly offended by the events in 2009 and 2010, they are not of the serious nature described in *Nelson* or *Boyer-Liberto*.  *Id.*; *Boyer-Liberto*, 786 F.3d at 280-81.  Moreover, none of the statements made or actions of which Plaintiff complaints were perpetrated by a supervisor.  *But see Boyer-Liberto*, 786 F.3d at 280-81 (recognizing the severity of racial epithets directed at an employee by a supervisor); *see also McIver*, 42 F.4th at 410. Further, while the 2010 event in which Plaintiff's turnout gear was strung up in the ceiling would be annoying or unwelcomed, it can hardly be stated to be of the severity necessary to prove a hostile work environment claim. *Nelson*, 2026 WL 118358, at *6; *see also McIver*, 42 F.4th at 410.  Similarly, no more compelling are the statements that Plaintiff was not "Engine 13 material" or the placement of his own soiled

dinner plate in his locker with a message to clean up after himself. *McIver*, 42 F.4th at 410 ("[A coworker] as no degree of control over [a plaintiff], which gives [allegedly discriminatory] comments less weight in the hostile-workplace analysis.").

Ultimately, considering each of the allegations underlying a hostile work environment, including those Plaintiff abandons in his brief, none of these events, taken together, rise to the kind of conduct that would "amount to discriminatory changes in the terms and conditions of employment" considering their infrequency, lack of severity, and context. *Perkins*, 936 F.3d at 208. While Plaintiff was undoubtedly involved in several workplace conflicts that angered him, the evidence presented is insufficient to overcome the high bar imposed on hostile work environment claims.

Therefore, Defendant's motion for summary judgment is GRANTED with respect to Count II.

### E.    There Exists a Genuine Issue of Material Fact Concerning Retaliation

Finally, Defendant moves for summary judgment on Plaintiff's Retaliation claim (Count III). Title VII prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. *Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). Again, the *McDonnell Douglas* test applies. *Johnson v. United Parcel Serv., Inc.*, 839 Fed. Appx. 781, 782-83 (4th Cir. 2021) (citing *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013). Thus, to survive summary judgment, Plaintiff must establish a prima facie case by showing he engaged in a protected activity, his employer took an adverse action against him, and a causal relationship existed between the protected activity and the adverse employment decision. *Roberts v. Glenn Industrial Group, Inc.*, 998 F.3d 111, 122 (4th Cir. 2021). Plaintiff begins by arguing that he

engaged in protected activity by reporting "racially discriminatory and harassing conduct by white colleagues to his supervisors." (ECF No. 34 at 18). Plaintiff posits that the adverse employment action includes the dinner-plate argument in which "Remeikis hurling racial slurs at Plaintiff and, along with another white firefighter, threatening Plaintiff's life.[12]" *Id.* As Defendant points out, the causation element here fails, consistent with the analysis set forth *supra* Section III.D.1. Plaintiff does, however, point to the discipline that resulted from the dinner-plate altercation (and related transfer decisions.

A plaintiff may demonstrate the requisite causal link by (1) by establishing a "temporal proximity between the protected activity and adverse action," or (2) by establishing that "other relevant evidence indicates 'continuing retaliatory conduct and animus' toward the plaintiff." *Alberti v. Rector and Visitors of the University of Virginia*, 65 F.4th 151, 156 (4th Cir. 2023) (quoting *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007)). Generally "the gap between the protected activity and the adverse employment action can generally be no longer than two months." Barnhill v. Bondi, 138 F.4th 123, 132 (4th Cir. 2025); *see also Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021) (noting that three months was insufficient to infer a causal relationship without other evidence of a causal link). Further, "intervening events can bridge what would otherwise be a prohibitively long temporal gap." *Barbour v. Garland*, 105 F.4th 579, 593 (4th Cir. 2024) (citing *Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022)).

Here, Plaintiff reported an allegation of racial discrimination multiple times in January 2013. (ECF No. 29-14 at 11-12). Thereafter, on February 21, 2013, an investigation had been completed, at which point the investigating chief recommended that Plaintiff's claim against FF/EMT Remeikis and PO Wenger, including that of racial discrimination, should be dismissed

---

[12] As explored in *supra* Section III.D.1, this characterization of the evidence is a serious deviation from the evidence on the record and unsupported as a matter of law.

and the claims against Plaintiff should be substantiated. *Id.* at 20-21. On March 8, 2013, the department sent Plaintiff a hearing notice resulting from this incident, which took place on April 25, 2013. *Id.* at 22, 25. From what the Court can discern of the record, the decision was made final on June 27, 2013. *Id.* at 26. Therefore, considering that the investigation and disciplinary decisions were set in motion within one month after Plaintiff first complained of racial discrimination, the department had knowledge of it during the course of its investigation, by its own admission, and adopted the same recommended discipline as first suggested in February 2013, the Court is satisfied that Plaintiff has established evidence of a prima facie case. *See Holloway*, 32 F.4th at 300 (recognizing that an impermissible temporal gap was tempered by the defendant's intervening awareness of a protected complaint).

The remaining arguments mirror those set forth under Counts I, IV, and V. Therefore, consistent with the Court's analysis on that issue, there is, at the very least, a genuine issue of material fact concerning whether the adverse employment actions were a mere pretext for discrimination when they knew Plaintiff complained of racial discrimination and decided to discipline him instead of his white counterparts for their involvement in the same argument. Therefore, to that extent only, Defendant's Motion for Summary Judgment is DENIED to the extent that Plaintiff relies on disparate discipline of similarly situated comparators resulting from the dinner-plate altercation and related transfer decisions. Otherwise, Summary Judgment is GRANTED.

## IV.  CONCLUSION

For the foregoing reasons, it is this <u>17th</u> day of <u>February 2026,</u> hereby **ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 29) is:

(1)      DENIED with respect to Counts I, IV, and V to the extent that Plaintiff relies on disparate discipline of similarly situated comparators resulting from the dinner-plate altercation, and is otherwise GRANTED;

(2)      GRANTED with respect to Count II;

(3)      DENIED with respect to Count III to the extent that Plaintiff relies on disparate discipline of similarly situated comparators resulting from the dinner-plate altercation and related transfer decisions, and is otherwise GRANTED; and

(4)      The Court also DENIES Plaintiff's Motion for Summary Judgment as containing no substantive request for summary judgment nor any arguments supporting summary judgment in Plaintiff's favor. (ECF No. 34).[13]

The parties are hereby directed to confer and jointly inform the Court within fourteen (14) days from the date of this Memorandum Order and Opinion whether there is mutual desire to participate in a settlement conference before proceeding to schedule a trial and related dates.


Dated: February 17, 2026                                /s/
                                                  J. Mark Coulson
                                                  United States Magistrate Judge

---

[13] Plaintiff's Opposition, styled as a Motion for Summary Judgment, does not move for summary judgment.